## UNITED STATES DISTRICT COURT
## DISTRICT OF DELAWARE

_____

| | |
|---|---|
| MARK RESPLER, Derivatively on Behalf of MAGNUM HUNTER RESOURCES CORP., | ) ) ) |
| Plaintiff, | ) ) ) |
| v. | ) ) |
| GARY C. EVANS, J. RALEIGH BAILES, BRAD BYNUM, VICTOR CARRILLO, STEPHEN C. HURLEY, JOE L. MCCLAUGHERTY, RON ORMAND, STEVEN PFEIFER, JEFF SWANSON, FRED J. SMITH and DAVID KREUGER, | ) ) ) ) ) ) ) |
| Defendants. | ) ) |
| vs. | ) ) |
| MAGNUM HUNTER RESOURCES CORP., a Delaware Corporation, | ) ) ) |
| Nominal Defendant. | ) ) |

Civil Action No. _____

_____

## VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

Plaintiff, by his undersigned attorneys, for his Shareholder Derivative Complaint, based upon, *inter alia*, the investigation made by and through his attorneys, alleges as follows:

## SUMMARY OF ACTION

1.     This is a shareholder derivative action brought by plaintiff on behalf of nominal defendant Magnum Hunter Resources Corp. ("MHR" or the "Company") against its Board of Directors and current and former senior officers, for breaching the fiduciary duties owed to MHR and its shareholders and/or aiding and abetting those breaches of fiduciary duty.

2.     On March 18, 2013, Magnum Hunter disclosed material internal control weaknesses, including in its internal controls over financial reporting, and a lack of sufficient

qualified personnel to design and manage an effective control environment, that impacted its period-end financial reporting processes and share-based compensation.  Shortly thereafter, on April 16, 2013, MHR announced that it had dismissed its outside auditors, PricewaterhouseCoopers LLP ("PwC") (the second auditor it dismissed in less than a year), after PwC advised the Company of material weaknesses in its internal accounting controls.  MHR also disclosed that PwC had identified various issues that, if PwC had investigated, may have had a material impact on the fairness or reliability of MHR's previously reported consolidated financial reports.  Moreover, on May 17, 2013, MHR disclosed through the filing of a Form 8-K with the SEC, that the Company had received a letter from the New York Stock Exchange MKT ("NYSE MKT") that it was not in compliance with the NYSE MKT's listing standards.

3.      As a result of Defendants' misconduct, since as early as January 2012 and until the present (the "relevant time period"), MHR has suffered significant damages, and will continue to suffer damages unless immediate action against the wrongdoers is taken by the Company.  Such action is highly unlikely given the substantial benefits and emoluments that Defendants receive as a result of the Defendants' positions as Directors, as well as their other positions of control.  In addition, the Defendants have numerous other relationships with the allegations of wrongdoings alleged herein which would prevent them from acting independently in assessing a demand on the Board.  For instance, a number of the Defendants are top executives of GreenHunter Energy, Inc. ("GreenHunter").  As alleged herein, during the relevant time period, all of MHR's in-house accounting services were provided by GreenHunter employees.  Other relationships and entanglements further prevent the Defendants from acting independently.  Absent judicial intervention, Defendants will not take the action requested

herein, and, in the continued breach of their fiduciary duties, they will persist in allowing the wrongdoers to escape justice.

## THE PARTIES

4.     Plaintiff is a current shareholder and has owned shares of MHR at all times relevant hereto.

5.     MHR is a corporation duly organized and existing under the laws of the State of Delaware and maintains its principal executive offices in Houston, Texas.   MHR is an independent oil and gas company that engages in the acquisition, exploration, exploitation, development, and production of crude oil, natural gas, and natural gas liquids primarily in West Virginia, Kentucky, North Dakota, and Texas, as well as Saskatchewan, Canada.

6.     Defendant Gary C. Evans ("Evans") has been a director of MHR since 2009. Evans serves as the Company's Chairman of the Board of Directors (the "Board") and Chief Executive Officer.   During the relevant time period, Evans sold 325,000 MHR shares for total proceeds of approximately $1.3 million.   In addition, Evans signed the Company's 2011 Form 10-K and certified the 2011 Form 10-K pursuant to the Sarbanes Oxley Act of 2002.   Evans is also the majority stockholder, founder, Chief Executive Officer, and Chairman of GreenHunter. During the relevant time period, all of MHR's in-house accounting services were provided by GreenHunter employees.

7.     Defendant J. Raleigh Bailes ("Bailes") has been a director of MHR since 2006. Bailes serves as Chair of the Company's Audit Committee.   Bailes has been a partner of Bailes, Bates & Associates, a tax accounting firm.   During the relevant time period, Bailes sold 45,000 MHR shares for total proceeds of approximately $301,000.

8.      Defendant Brad Bynum ("Bynum") has been a director of MHR since 2006. Bynum is a member of the Company's Audit and Governance Committees.  Bynum currently serves as President (formerly the Chief Financial Officer) of Howard Energy Partners.

9.      Defendant Victor Carrillo ("Carrillo") has been a director of MHR since January 2011.  Carrillo serves as Chair of the Company's Governance Committee.  Carrillo currently serves as President and Chief Operating Officer and a director of Zion Oil & Gas, Inc.

10.     Defendant Stephen C. Hurley ("Hurley") has been a director of MHR since October 2011.  Hurley is a member of the Company's Audit and Compensation Committees. Hurley is a former director of Brigham Exploration Company and was a member of Brigham's Audit and Compensation Committees.

11.     Defendant Joe L. McClaugherty ("McClaugherty") has been a director of MHR since 2006.  McClaugherty is the Chair of the Company's Compensation Committee and a member of the Audit Committee.  McClaugherty is a Senior Partner of McClaugherty & Silver, P.C.

12.     Defendant Ron Ormand ("Ormand") has been a director of MHR since 2009.  In addition, Ormand has been the Company's Chief Financial Officer since 2009.  Ormand also signed the Company's 2011 Form 10-K and certified the 2011 Form 10-K pursuant to the Sarbanes Oxley Act of 2002.  During the relevant time period, Ormand was a director of GreenHunter, and as of 2012, owned approximately 321,820 shares of GreenHunter.

13.     Defendant Steven Pfeifer ("Pfeifer") has been a director of MHR since May 2006. Pfeifer is a member of the Company's Compensation and Governance Committees.  Pfeifer currently serves as the Managing Partner of P.O. & G. Resources, L.P.

14.    Defendant Jeff Swanson ("Swanson") has been a director of MHR since 2009. Swanson is a member of the Company's Compensation Committee.  Swanson currently serves as President and Chief Executive Officer of GrailQuest Corp.   During the relevant time period, Swanson sold 77,520 MHR shares for total proceeds of approximately $199,000.

15.    Defendant Fred J. Smith ("Smith") served as MHR's Chief Accounting Officer ("CAO") since October, 2012.

16.    Defendant David Krueger ("Krueger") served as MHR's CAO from October 2009 to October 2012, when he was replaced by Defendant Smith.  Krueger also serves as CFO of GreenHunter.   During the relevant time period, Krueger sold 172,500 MHR shares for total proceeds of approximately $645,000.    As of 2013, Krueger owned 36,072 shares of GreenHunter.

17.    Defendants Evans, Bailes, Bynum, Carrillo, Hurley, McClaugherty, Ormand, Pfeifer, Swanson, Smith and Krueger are collectively referred to herein as the "Defendants" or the "Individual Defendants."

18.    (a)    The Individual Defendants, by reason of their status as MHR officers and executives or members of the Board have and had the power and influence, and did in fact control and influence and cause MHR to engage in the unlawful acts and conduct complained of herein.  Each of the Individual Defendants is liable as a direct participant in, and aider and abetter of, the wrongs complained of herein.

(b)    By reason of their positions and because of their ability to control the business and corporate affairs of MHR, the Defendants owe and have owed MHR and its shareholders the highest fiduciary obligations of fidelity, trust, loyalty, and due care, and were and are: required to use their utmost ability to control and manage MHR in an ethical, lawful,

fair, just, and equitable manner; act in furtherance of the best interests of MHR and its shareholders in compliance with legal and ethical requirements; and act with complete candor toward the Company's public shareholders.  In addition, each director of MHR owes and has owed to MHR and its shareholders the fiduciary duties to exercise due care and diligence in the administration of the affairs of MHR and in the use and preservation of its property and assets, and the highest obligations of ethical and lawful conduct, good faith and fair dealing.

19.    The Individual Defendants serving on the Audit Committee are charged with specific oversight responsibilities.  As set forth in the Company's Proxy Statement, filed with the SEC on November 28, 2012 (the "Proxy Statement"):

> Our Audit Committee assists the Board in fulfilling its oversight responsibilities by, among other things, reviewing the financial information that will be provided to the stockholders and others; reviewing the systems of internal controls that management has established; appointing, retaining and overseeing the performance of independent accountants; and overseeing our accounting and financial reporting processes and the audits of our financial statements.  Our Audit Committee also consults with our management and our independent registered public accounting firm prior to the presentation of financial statements to stockholders and related press releases and, as appropriate, initiates inquiries into aspects of our financial affairs.  Our Audit Committee is responsible for establishing procedures for the receipt, retention and treatment of complaints regarding accounting, internal accounting controls or auditing matters, and for the confidential, anonymous submission by our employees of concerns regarding questionable accounting or auditing matters.  In addition, our Audit Committee is directly responsible for the appointment, retention, compensation and oversight of the work of our independent auditors, including approving services and fee arrangements.

20.    The Individual Defendants serving on the Company's Governance Committee are charged with specific oversight responsibilities.  As set forth in the Company's Proxy Statement:

> Our Governance Committee's responsibilities include identifying individuals qualified to become Board members consistent with criteria approved by the Board and recommending candidates for election to our Board; reviewing and recommending changes, when necessary, to the Board regarding the Corporate Governance Guidelines of the Company; overseeing the director nomination process and the evaluation of the Board and management; reviewing the

independence of each Board member and making recommendations to the Board regarding director independence; reviewing and resolving issues pertaining to related-party transactions and conflicts of interests; and evaluating and, if necessary, recommending changes to the Board regarding Board processes and policies.

21.     The Individual Defendants serving on the Company's Compensation Committee are charged with specific responsibilities.  As set forth in the Company's Proxy Statement:

Our Board's Compensation Committee discharges the Board's responsibilities relating to the compensation of our directors and officers.  The Compensation Committee has the overall responsibility for, among other things, establishing the compensation levels and direct and indirect benefits of our officers and directors; making recommendations to the Board with respect to the establishment and terms of incentive compensation plans and equity-based plans and administering such plans; reviewing and evaluating the Company's compensation program and such program's coordination and execution; establishing and reviewing policies with respect to management and director perquisities; engaging any outside consultant to assist in determining appropriate compensation levels for our officers and directors; and reviewing and discussing with management the Compensation Discussion and Analysis included in the Company's annual report on Form 10-K or proxy statement.  In addition, our Compensation Committee administers our Stock Incentive Plan, including reviewing and granting stock options and other share-based awards, with respect to our directors, officers and our other employees.

22.     According to the Company's Proxy Statement, compensation for the Defendants for the 2011 fiscal period was as follows:

### 2011 Director Compensation Table

| Name | Fees Earned or Paid in Cash | Option Awards (1)(2) | Stock Awards (1) | All Other Compensation (3) | Total |
|------|------|------|------|------|------|
| J. Raleigh Bailes, Sr. | --- | $  154,173 | $  36,495 | --- | $  190,668 |
| Brad Bynum | --- | $  154,173 | $  45,501 | --- | $  199,674 |
| Victor C. Carrillo | --- | $  291,122 | $  18,003 | --- | $  309,125 |
| Stephen C. Hurley | --- | $   67,516 | $   2,998 | --- | $   70,514 |
| Joe L. McClaugherty | --- | $  154,173 | $  52,003 | --- | $  206,176 |
| Steven A. Pfeifer | --- | $  154,173 | $  32,501 | --- | $  186,674 |
| Jeff Swanson | --- | $  154,173 | $  30,507 | --- | $  184,680 |

23.     In addition, as reported in the Company's Proxy Statement, the Defendants maintain significant holdings of MHR shares.

7

| Name | Share Ownership |
|------|-----------------|
| J. Raleigh Bailes | 333,636 |
| Brad Bynum | 530,371 |
| Victor Carrillo | 128,473 |
| Gary C. Evans | 6,736,324 |
| Stephen C. Hurley | 109,609 |
| Joe L. McClaugherty | 967,884 |
| Steven Pfeifer | 525,715 |
| Jeff Swanson | 281,752 |
| Ron Ormand | 2,235,606 |

24.     The Individual Defendants, because of their positions of control and authority as executive officers and/or directors of MHR, were able to, and did, directly and indirectly, control the matters and transactions complained of herein.  These Defendants have and have had the duty to exercise reasonable control and supervision over the officers, employees, agents, business and operations of the Company in good faith and with loyalty; to be and remain informed as to how the Company was operating and, upon receiving notice or information of an imprudent, questionable, unsound, unethical or unlawful decision, condition, or practice, make reasonable inquiry and, if necessary, make all reasonable remedial efforts; and to conduct the affairs of the Company ethically and in compliance with law to provide the highest quality services and maximize the profitability of the Company for the benefit of its shareholders.

**JURISDICTION AND VENUE**

25.     This Court has Jurisdiction over this action pursuant to 28 U.S.C. §1332 in that Plaintiff and Defendants are citizens of different states and the amount in controversy exceeds $75,000, exclusive of interest and costs.  This Court has supplemental jurisdiction over the state law claims asserted herein pursuant to 28 U.S.C. §1367(a).  This action is not a collusive one to confer jurisdiction on a court of the United States which it would not otherwise have.

26.     Venue is proper in this District pursuant to 28 U.S.C. §1391 because:  (a) MHR is incorporated in this District; and (b) a substantial portion of the transactions and wrongs complained of occurred here.

## SUBSTANTIVE ALLEGATIONS

### A.     Background

27.     During the relevant time period, MHR had multiple securities registered under the Securities Act and available to investors that subject it to the financial reporting requirements of the securities laws and SEC regulations promulgated thereunder.  Defendants, however, utterly failed to maintain internal controls required under those laws and regulations.  During the relevant time period, MHR did not maintain any real internal auditing staff.  Instead, MHR relied upon the staff of GreenHunter, another publicly-traded company that provided MHR with internal auditing services.  Defendant Evans, the Chairman of the MHR Board, is the majority shareholder of GreenHunter and he along with Defendants Ormand, and Krueger, are top executives at GreenHunter.

### B.     MHR's Lack of Internal Control Over the Financial Reporting Process

28.     During the relevant time period, the Defendants filed numerous financial statements with the SEC and publicly reported those financials to MHR shareholders and the investment community.  The Defendants repeatedly represented to MHR shareholders that MHR and its Directors adhere to a strict standard of business conduct.  According to the Company's Proxy Statement, the Company adopted a Code of Conduct and Ethics, the purpose of which is to promote, among other things:

- Honest and ethical conduct, including ethical handling of actual or apparent conflicts of interest;

- Full, fair, accurate and timely disclosure in filings with the SEC and other public disclosures;

- Compliance with the law and other regulations;

- Protection of [MHR] assets;

- Insider trading policies; and

- Prompt internal reporting of any violation of the code.

29.    MHR further represented that it adheres to published Corporate Governance Guidelines.  As represented in the Company's Proxy Statement:

> The business, property and affairs of Magnum Hunter are managed by our Chief Executive Officer under the direction of our Board.  The Board is responsible for establishing broad corporate policies and for overall performance and direction of Magnum Hunter, but is not involved in day-to-day operations.  Members of the Board keep informed of Magnum Hunter's business by participating in Board and committee meetings, by reviewing analyses and reports sent to them regularly, and through discussions with the Chief Executive Officer and other executive officers.

> We have adopted Corporate Governance Guidelines that address significant issues of corporate governance and set forth the procedures by which the Board carries out its responsibilities.  Among the areas addressed by the guidelines are director qualifications and responsibilities, Board committee responsibilities, selection and election of directors, director compensation and tenure, Board meeting requirements and Board and committee performance evaluations.  The Governance Committee is responsible for assessing and periodically reviewing the adequacy of these guidelines.

30.    In addition, the Company repeatedly stressed that it follows strict internal controls with respect to financial reporting.  On February 29, 2012, Defendants filed a Form 10-K with the SEC for the fiscal year ended December 31, 2011, which further detailed the Company's fourth quarter and fiscal 2011 financial results and was signed by Defendants Evans, Ormand, Bailes, Bynum, Carrillo, Hurley, McClaugherty, Pfeifer, Swanson, and Krueger (the "2011 10-K").  As to the Company's "Controls and Procedures," the 2011 10-K stated:

> Evaluation of Disclosure Controls and Procedures

> As of the end of the period covered by this report, an evaluation of the effectiveness of the design and operation of the Company's disclosure controls

and procedures (as defined in Rule 13a-15e under the Exchange Act) was performed under the supervision and with the participation of the Company's management, including our Chief Executive Officer and Chief Financial Officer. Based on that evaluation, the Company's Chief Executive Officer and Chief Financial Officer concluded that the Company's disclosure controls and procedures were effective as of December 31, 2011 to ensure:  that information required to be disclosed in the reports it files and submits under the Exchange Act is recorded, processed, summarized and reported within the time periods specified in the SEC's rules and forms; and that information that is required to be disclosed under the Exchange Act is accumulated and communicated to the Company's management, including our Chief Executive Officer and Chief Financial Officer, as appropriate to allow timely decisions regarding required disclosure.

The Company acquired Williston Hunter Canada, Inc., Williston Hunter, Inc., and Magnum Hunter Production, Inc. during fiscal 2011.  As permitted by SEC guidance, management excluded the acquired companies from its assessment of the effectiveness of the Company's internal control over financial reporting as of December 31, 2011.  Williston Hunter Canada, Inc., Williston Hunter Inc., and Magnum Hunter Production, Inc. are wholly owned subsidiaries whose total assets and net income represent approximately 34% and 35%, respectively, of the related consolidated financial statement amounts as of and for the year ended December 31, 2011.

The effectiveness of the Company's internal controls over financial reporting as of December 31, 2011, has been audited by Hein & Associates, LLP, an independent registered public accounting firm, as stated in their attestation report which is included in Item 8, "Financial Statements and Supplementary Data."

31.     The 2011 10-K was also certified by Defendants Evans and Ormand pursuant to

the Sarbanes Oxley Act of 2002, attaching dual certificates with each stating that:

1.      I have reviewed this annual report on Form 10-K of the Company;

2.      Based on my knowledge, this annual report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3.      Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

4.      The registrant's other certifying officer(s) and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in

Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and have:

a)   Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

b)   Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

c)   Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

d)   Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5.   The registrant's other certifying officer(s) and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

a)   All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

b)   Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

32.   On November 28, 2012, Defendants filed with the SEC MHR's Definitive Proxy Statement in connection with MHR's up-coming annual Meeting of Shareholders.  Included as part of the Proxy Statement was Defendant Evans' letter to common stockholders and special

meeting of holders of the Company's series C, series D, and series E preferred stock.  In MHR's Proxy Statement, the Defendants made various representations regarding the soundness of MHR's internal controls and the reliability of MHR's financial statements.  Under Proposal No. 2, ratification of the appointment of PwC as MHR's independent preferred public accounting firm for the fiscal year ending December 31, 2012, the Defendants represented:

> The Audit Committee has engaged PwC as our independent registered public accounting firm to audit the Company's financial statements for the fiscal year ending December 31, 2012, and the Board is submitting such selection to the Company's common stockholders for their ratification. Although the Company is not required to obtain stockholder ratification of the appointment of PwC, the Board considers the selection of an independent registered public accounting firm to be an important matter to stockholders and considers such proposal to be an opportunity for stockholders to provide input to the Audit Committee and the Board on a key corporate governance issue.

> The Audit Committee believed it to be in the best interests of our stockholders to have engaged PwC as our independent registered public accounting firm to audit the Company's financial statements for the fiscal year ending December 31, 2012. If the common stockholders fail to ratify the selection, the Audit Committee will consider whether it is appropriate to select another independent registered public accounting firm for the 2013 fiscal year. Even if the selection is ratified, the Audit Committee in its discretion may appoint a different independent public accounting firm at any time during the year if it determines that such a change would be in our best interests and those of our stockholders.

> No relationship between the Company and PwC exists other than the usual relationship between independent auditor and client.

> The Audit Committee had initially selected and engaged Hein as the Company's independent registered public accountants for fiscal 2012. Hein had also audited the Company's financial statements for 2009, 2010 and 2011. In spring of 2012, the Company began to evaluate whether the Company needed a larger accounting firm. As a result, senior management of the Company concluded that it would be in the Company's best interests for the Company to engage a new independent registered public accounting firm for 2012 with a greater depth of resources to accommodate the Company's rapidly expanding and widespread operations as well as its accessing the public capital markets. On May 25, 2012, Hein informed the Company that it declined to stand for re-election as the Company's independent registered public accounting firm for the fiscal year ending December 31, 2012. The Audit Committee charged senior management of the Company with undertaking a search on the Audit Committee's behalf for appropriate candidates to serve as the Company's new independent registered

public accounting firm. The Company evaluated a number of candidates, and, following completion of such evaluations, the Audit Committee selected and engaged PwC as the Company's independent registered public accounting firm for fiscal 2012.

Hein's audit reports on the Company's consolidated financial statements as of and for the years ended December 31, 2011 and 2010 did not contain any adverse opinions or disclaimers of opinion and were not qualified or modified as to uncertainty, audit scope or accounting principles. The audit reports of Hein on the effectiveness of internal control over financial reporting as of December 31, 2011 and 2010 did not contain any adverse opinions or disclaimers of opinion, nor were they qualified or modified as to uncertainty, audit scope or accounting principles.

During the years ended December 31, 2011 and 2010, and the subsequent interim period through June 1, 2012, there were (i) no disagreements between the Company and Hein on any matter of accounting principles or practices, financial statement disclosure or auditing scope or procedure, which disagreements, if not resolved to the satisfaction of Hein, would have caused Hein to make reference to the subject matter of the disagreement in their reports on the Company's consolidated financial statements for such years, and (ii) no "reportable events" as that term is defined in Item 304(a)(1)(v) of Regulation S-K.

During the Company's two most recent fiscal years ended December 31, 2011 and through the date of PwC's engagement, the Company did not consult with PwC on (i) the application of accounting principles to a specified transaction, either completed or proposed, or the type of audit opinion that may be rendered on the Company's financial statements, and PwC did not provide either a written report or oral advice to the Company that PwC concluded was an important factor considered by the Company in reaching a decision as to any accounting, auditing, or financial reporting issue; or (ii) any matter that was either the subject of any disagreement (as defined in Item 304 (a)(1)(iv) of Regulation S-K and the related instructions to Item 304 of Regulation S-K) or a reportable event (as described in Item 304(a)(1)(v) of Regulation S-K).

## C.     MHR's Lack of Internal Controls is Revealed

33.     On November 9, 2012, MHR filed a Notification of Late Filing with the SEC on Form 12b-25 wherein Defendants announced that the Company was in the process of restating previously issued unaudited financial statements for the quarter ended June 30, 2012.  According to the filing:

As reported under Item 4.02 of the Current Report on Form 8-K (the "Form 8-K") filed with the Securities and Exchange Commission on October 22, 2012 by Magnum Hunter Resources Corporation (the "Company"), the Company is in the

process of restating its previously issued unaudited financial statements for the quarterly period ended June 30, 2012 included in its Quarterly Report on Form 10-Q (the "Restatement"). The Company is working diligently to complete the Restatement, evaluating identified control deficiencies and the closing and reporting process, including completing and providing the necessary information to its newly appointed Independent Auditors for them to complete their review. Therefore, the Company is unable to complete the Restatement process, evaluate its conclusions regarding internal controls, and file its Quarterly Report on Form 10-Q (the "Form 10-Q") for the period ended September 30, 2012 on or before the prescribed due date of November 9, 2012 without unreasonable effort or expense for the reasons described above.

The Company anticipates that it will file the Quarterly Report no later than the fifth calendar day following the prescribed filing date. We refer you to the Form 8-K for more information related to the Restatement, including, without limitation, the nature of the accounting error giving rise to the Restatement.

34.     On November 14, 2012, MHR disclosed on Form 8-K that the Company yet again failed to hold an annual meeting of shareholders.  The Form 8-K went on to state that "On November 2, 2012, the SEC notified the Company that the SEC will be reviewing the Company's Preliminary Proxy Statement, which was filed with the SEC on October 26, 2012. The Company will address the SEC's comments to the Preliminary Proxy Statement, if any, once received."

35.     The same day, MHR filed its Quarterly Report on Form 10-Q with the SEC for its third quarter of fiscal 2012, ending September 30, 2012, which was signed by Defendants Evans and Ormand, and also contained Sarbanes Oxley certifications signed by Defendants Evans and Ormand.  The Company's restated Quarterly Report for the quarterly period ended June 30, 2012, filed with the SEC on Form 10-Q on August 9, 2012, contained the following description of Magnum Hunter's disclosure controls and procedures as well as assurances to MHR investors that MHR's filed financial statements are reliable and prepared in accordance with Generally Acceptable Accounting Principles ("GAAP").  According to the Defendants:

**Weaknesses in Internal Controls**

In October and November 2012, we identified material weaknesses in our internal controls over financial reporting in connection with (i) our lack of sufficient qualified personnel to design and manage an effective control environment, (ii) our period-end financial reporting process and (iii) our share-based compensation. We have promptly implemented, and are implementing, measures we believe will effectively address these weaknesses. However, any failure to do so could adversely affect our compliance with our reporting obligations under the Securities Exchange Act of 1934, and our compliance with our debt covenants, and therefore our ability to effect borrowings and readily access the capital markets to provide required liquidity.

* * *

**Evaluation of disclosure controls and procedures**

We maintain disclosure controls and procedures that are designed to provide reasonable assurance that information required to be disclosed in the reports we file under the Securities Exchange Act of 1934, as amended (the "Exchange Act"), is recorded, processed, summarized and reported within the time periods specified in the SEC's rules and forms. Such controls include those designed to provide reasonable assurance that information for disclosure is accumulated and communicated to management, including the Chairman and Chief Executive Officer ("CEO") and the Chief Financial Officer ("CFO"), as appropriate, to allow timely decisions regarding required disclosure.

Our management, with the participation of our CEO and CFO, has evaluated the effectiveness of our disclosure controls and procedures (as defined in Rule 13a-15(e) under the Exchange Act) as of September 30, 2012. Based on this evaluation, our CEO and CFO have concluded that, as of September 30, 2012, our disclosure controls and procedures were not effective due to the material weaknesses described below.

To address the material weaknesses described in this Item 4, we performed additional analyses and other post-closing procedures designed to provide reasonable assurance that our consolidated financial statements were prepared in accordance with generally accepted accounting principles in the United States of America ("US GAAP"). As a result of these procedures, we believe that the consolidated financial statements included in this report fairly present, in all material respects, our financial condition, results of operations, changes in stockholders' equity and cash flows for the periods presented, in conformity with US GAAP.

**Limitations inherent in all controls**

Our management, including the CEO and CFO, recognizes that the disclosure controls and procedures (discussed above) and internal controls over financial reporting may not prevent or detect misstatements or fraud. Any controls system, no matter how well designed and operated, can only provide reasonable, and not absolute, assurance of achieving the desired control objectives. Because of such limitations there is a risk that material misstatements or instances of fraud will not be prevented or detected on a timely basis by the financial reporting process. However, these inherent limitations are known features of the financial reporting process. Therefore, it is possible to design into the process safeguards to reduce, though not eliminate, this risk.

**Material Weaknesses**

A material weakness is a control deficiency, or a combination of control deficiencies, in internal control over financial reporting, such that there is a reasonable possibility that a material misstatement of our annual or interim financial statements will not be prevented or detected on a timely basis.

In connection with the restatements and audit adjustments identified, management identified the material weaknesses described below.

Lack of sufficient, qualified personnel to design and manage an effective control environment. We did not design an effective control environment with the sufficient complement of personnel with the appropriate level of accounting knowledge, experience, and training in US GAAP to assess the completeness and accuracy of the accounting for complex accounting matters, principally related to equity instruments including convertible preferred stock and related arrangements. This material weakness resulted in the restatement of our Series A Convertible Preferred Units of Eureka Hunter, our commodity and preferred stock embedded derivative liabilities and our loss on derivatives and related disclosures for the three and six month periods ended June 30, 2012 discussed above and resulted in audit adjustments to our condensed consolidated financial statements for the three and nine month periods ended September 30, 2012. This material weakness also contributed to the material weaknesses described below.

Period-end financial reporting process. We did not maintain effective controls over the period-end financial reporting process, including controls with respect to the preparation, review, supervision, and monitoring of accounting operations. Specifically, we did not maintain effective controls to provide reasonable assurance that monthly account reconciliations were reviewed on a timely basis and that monthly and quarterly financial information was prepared and reviewed timely. This material weakness resulted in audit adjustments to our condensed consolidated financial statements for the three and nine month periods ended September 30, 2012.

Share-based compensation. We did not design effective controls over share-based compensation expense, which is recorded in our general and administrative expenses. Specifically, we did not design effective controls related to the review of supporting details, including the completeness and accuracy of the vesting schedule and the journal entries for share-based compensation expenses. This control deficiency resulted in a misstatement of our general and administrative expense and share-based compensation related disclosures for the three and six month periods ended June 30, 2012 and resulted in the restatement discussed above.

Additionally, the material weaknesses described above could result in misstatements that would result in a material misstatement of the consolidated financial statements in a future annual or interim period that would not be prevented or detected.

**Changes in Internal Control over Financial Reporting**

Except for the material weaknesses discussed above and the remediation plans executed as of September 30, 2012 as noted below, there were no changes made in our internal control over financial reporting (as defined in Rule 13a-15 (f) under the Exchange Act) during the three months ended September 30, 2012, that have materially affected, or are reasonably likely to materially affect, our internal control over financial reporting.

36.     On November 16, 2012, Defendants filed with the SEC a Notice of Postponement of the November 26, 2012 Annual Meeting of Shareholders (the "Annual Meeting") on Form 8-K.

37.     On December 31, 2012, Magnum Hunter disclosed that in connection with the prior postponements of the Annual Meeting, the NYSE notified the Company on October 16, 2012 that the Company was at risk of violating Section 302.00 of the NYSE's listing standards, which requires listed companies to hold an annual shareholders' meeting during each fiscal year. On November 19, 2012, the Company requested an extension of time within which to hold the Annual Meeting. On November 30, 2012, the NYSE granted the Company's requested extension and agreed to waive the requirement of Section 302.00 provided that the Company would hold the Annual Meeting on January 17, 2013, which was held on that date.

38.    Notwithstanding the Defendants' assurances and representations regarding the Company's internal controls, on February 28, 2013, MHR announced that it would be unable to timely report its financial results for the fourth quarter and fiscal 2012.  The Company further disclosed that the defects in internal controls identified in connection with restating the 2Q'12 10-Q had not been remedied.  According to the Company:

> As previously disclosed in filings with the Securities and Exchange Commission (the "SEC"), in October and November 2012, Magnum Hunter Resources Corporation (the "Company") identified material weaknesses in its internal controls over financial reporting in connection with its (i) lack of sufficient qualified personnel to design and manage an effective control environment, (ii) period-end financial reporting process and (iii) share-based compensation. The Company devoted substantial time and effort to correcting the previously-filed financial statements and information that were impacted by these material weaknesses. Further, the Company implemented, and continues to implement, measures that it believes will effectively address these weaknesses in the future. The implementation of these measures has entailed the substantial efforts of accounting staff and the use of external resources. Additionally, the Company has devoted significant resources to preparing financial statements and information relating to the Company and its subsidiaries for inclusion in the exchange offer for Senior Notes contemplated by the Company's Registration Statement on Form S-4, which was declared effective by the SEC on February 7, 2013.
>
> The change in the Company's independent auditors, which occurred in July 2012, has resulted in a normal transition between accounting firms that has required the Company to devote more resources to this transition. Therefore, additional internal controls and significant review of certain financial matters were required by the new auditors.
>
> The diversion of these resources has caused the Company to be unable to compile all information necessary to prepare and file its Annual Report on Form 10-K for the year ended December 31, 2012 within the prescribed period (on or before March 1, 2013) without unreasonable effort or expense. The Company anticipates that it will file its Annual Report on Form 10-K no later than March 18, 2013.

39.    Thereafter, on March 18, 2013, MHR issued a press release entitled "Magnum Hunter Provides Update on Status of Annual Report on Form 10-K and Selected Unaudited Financial and Operating Data for the Three Months and Twelve Months Ended December 31, 2012," which further disclosed:

As previously disclosed, Magnum Hunter identified certain material weaknesses in its internal controls over financial reporting in connection with its (i) lack of sufficient qualified personnel to design and manage an effective control environment, (ii) period-end financial reporting processes and (iii) share-based compensation. Magnum Hunter has implemented, and continues to implement, measures to address these weaknesses in the future. These measures have included the employment of a significant number of more experienced accounting personnel, including the addition of the following new personnel: a chief accounting officer, a head of financial reporting, a head of internal audit, a head of tax, two Company controllers, and two regional controllers. In addition, Magnum Hunter is utilizing third party technical resources, including consultants and professional advisory firms, to assist in the implementation of these measures. Magnum Hunter also intends to implement a new integrated accounting and land information system during fiscal year 2013. The Company may identify additional material weaknesses as it finalizes its financial statements for fiscal 2012 and, if so, it will take appropriate measures to address any such weaknesses.

The Company's rapid growth, particularly during the last 24 months, has resulted in complex and challenging accounting issues and operational integration matters that have required a significant amount of time and human resources in order to complete the fiscal 2012 audit. Magnum Hunter continues to work diligently with PricewaterhouseCoopers LLP, its independent auditors, to provide all the necessary information, including the finalization of all adjustments and supporting analysis, so they can complete the audit of the Company's financial statements for the fiscal year ended December 31, 2012 as promptly as possible. At this time, Magnum Hunter is not aware of any disagreements with its auditors regarding the Company's fiscal 2012 financial statements. In addition, the Company has not discovered any material errors or omissions that would require a restatement of its previously issued unaudited 2012 quarterly financial information.

Magnum Hunter expects to obtain the necessary consents from its lenders under the Company's senior credit facility to allow the Company to provide its 2012 audited consolidated financial statements at a later date, and also expects to obtain similar consents from the lenders under Eureka Hunter Pipeline, LLC's credit facilities. In addition, Magnum Hunter intends to take the appropriate action to prevent or cure any default under the Company's senior notes indenture resulting from its failure to timely file this audited financial information.

40.     Yet, just one month after Defendants represented that they were "not aware of any disagreements with its auditors regarding the Company's fiscal 2012 financial statements," on April 16, 2013, MHR announced that it had dismissed PwC at the direction of its Audit Committee after PwC advised the Company of material weaknesses in the Company's internal

accounting controls.  Defendants disclosed that PwC had identified various issues that, if PwC had investigated, may have had a material impact on the fairness or reliability of MHR's previously reported consolidated financial reports, including: (1) valuation of the Company's oil and gas properties; (2) calculation of the Company's oil and gas reserves; (3) the Company's position with respect to certain tax matters; (4) the Company's accounting of its acquisition of NGAS Resources, Inc.; and (5) the Company's compliance with certain debt covenants.  In less than one year, this was the second such purportedly "independent" auditor the Company had dismissed in connection with the fiscal 2012 audit, and this second dismissal rendered the Company unable to provide audited financial statements for fiscal 2012.  MHR also disclosed on April 16, 2013 that ongoing, pervasive defects in its internal controls over financial reporting and material weaknesses in its internal financial and tax reporting capacities remained, precluding the Company from timely reporting audited 2012 financial results and requiring that it obtain waivers from its lenders as to debt covenants.

41.    On April 22, 2013, MHR was forced to disclose that PwC disagreed with MHR's characterization of their parting, disclosing that in an April 18, 2013 letter PwC sent to MHR (that was not disclosed until April 22, 2013) that PwC did "not agree with the statements concerning" whether there had been any "reportable events," as that term is defined in Item 304(a)(1)(v) of Regulation S-K under the Securities Act, relating to PwC's engagement as the Company's independent registered public accounting firm.  PwC further stated that "the description of reportable events should also indicate that [PwC] advised the Company that information came to [its] attention that [PwC] concluded materially impacts the fairness or reliability of the Company's consolidated financial statements and this issue was not resolved to [PwC] satisfaction prior to [its] dismissal…"

42.    On May 17, 2013, MHR disclosed through the filing of a Form 8-K with the SEC, that the Company had received a letter from the NYSE MKT that it was not in compliance with the NYSE MKT's listing standards.  According to the 8-K:

As previously disclosed, Magnum Hunter Resources Corporation (the "Company") has not timely filed with the Securities and Exchange Commission (the "SEC") its Annual Report on Form 10-K for the fiscal year ended December 31, 2012 (the "Form 10-K") or Quarterly Report on Form 10-Q for the fiscal quarter ended March 31, 2013 (the "Form 10-Q") pending completion of the audit of the Company's consolidated financial statements for the fiscal year ended December 31, 2012 by the Company's new auditors, BDO USA, LLC.  As previously disclosed, the Company's objective is to file the Form 10-K by June 17, 2013, and to file the Form 10-Q as soon as reasonably practicable thereafter.

As a result of the delayed filings of the Form 10-K and the Form 10-Q, on May 13, 2013, the Company received from the NYSE MKT a letter stating that the Company is not in compliance with the NYSE MKT's continued listing standards as set forth in Sections 134 and 1101 of the NYSE MKT's Company Guide.  Only the Company's Series C, Series D and depositary shares representing Series E preferred stocks are currently listed for trading on the NYSE MKT.  The Company's common stock is listed for trading on the New York Stock Exchange, and is not affected by these specific NYSE MKT listing standards.  Receipt of the NYSE MKT's letter does not have any immediate effect upon the listing of the Company's preferred stock.  Pursuant to the NYSE MKT's rules, the Company has until May 28, 2013 to submit a plan advising the NYSE MKT of actions it has taken, or will take, that will bring the Company into compliance with Sections 134 and 1101 of the Company Guide by no later than August 13, 2013.

As previously disclosed by the Company, the Company's management and accounting staff have been working diligently with the Company's new independent registered public accounting firm, BDO USA, LLC, to complete the audit of the Company's consolidated financial statements for the fiscal year ended December 31, 2012, and the Company's objective is to file the Form 10-K by June 17, 2013, and to file the Form 10-Q as soon as reasonably practicable thereafter.  The Company will submit to the NYSE MKT a compliance plan to this effect, as referred to in the previous paragraph.

43.    On June 14, 2013, MHR finally filed with the SEC its Form 10-K, for the year ended December 31, 2012.  Through the Form 10-K, MHR disclosed its financial and operating results for the three months and year ended December 31, 2012.  While MHR reported an increase in revenues of 138% for the twelve months ended December 31, 2012, MHR also

reported a net loss of $167.4 million for the twelve months ended December 31, 2012, compared to a net loss of $90.7 million for the prior year.

44.     Along with the Company's belatedly reported financial results, MHR confirmed the utter failure by the Defendants to maintain proper internal controls. According the Company's June 14, 2013, press release:

**Internal Controls**

As disclosed in the Company's Form 10-K for the fiscal year ended December 31, 2012, the Company identified a number of material weaknesses in its internal controls. The Board, Audit Committee and senior management of the Company recognize the importance of improving the Company's internal controls and are committed to remediating these material weaknesses as quickly as possible. The Company is implementing remediation plans which it believes will successfully address these material weaknesses. Management has significantly expanded the number and quality of staff; has added outside consultants with the knowledge, training and experience necessary to develop and support the Company's overall internal control environment; and is implementing new land and accounting information systems.

45.     Moreover, the Company in its 2012 Form 10-K further disclosed the numerous material weaknesses especially as they relate to MHR's ability to "maintain effective controls over the quarterly and annual financial reporting process," that MHR had been experiencing during the relevant time period:

*Effective Control Environment to Meet the Company's Growth*

- In certain areas the Company did not have sufficient personnel with an appropriate level of knowledge, experience and training commensurate with the growth of the Company's corporate structure and financial reporting requirements. The Company did not effectively establish controls, and upgrade resources around internal audit, tax, financial reporting and certain accounting areas. Adequate controls were not designed and in place to achieve operating effectiveness thereby resulting in the aforementioned deficiency. The Company did not establish effective controls over risk assessments commensurate with the growth of the Company's corporate structure and financial reporting requirements. Specifically, the Company did not have adequate processes to evaluate and scope business and information technology risks. This deficiency resulted in either not having adequate controls designed and in place or not achieving the intended operating effectiveness of controls.

- The Company did not design or maintain effective controls for its wholly-owned subsidiary, Magnum Hunter Production, Inc. (MHP), specifically around segregation of duties and timeliness of reporting with respect to revenue, joint interest, partnership accounting, and division of interests.

These material weaknesses above also contributed to the material weaknesses described below.

*Financial Reporting*

- The Company did not maintain effective controls over the recording and retention of journal entry support. The Company did not maintain effective monitoring of controls to ensure that journal entries were properly prepared with sufficient supporting documentation or were reviewed and approved to ensure the accuracy and completeness of the journal entries.

- The Company did not maintain effective controls over financial statement disclosures to ensure completeness and accuracy of condensed consolidating guarantor financial statement footnote information for the nine-month period ended September 30, 2012. The Company was unable to demonstrate remediation of this deficiency as of December 31, 2012, as the control require at least two quarters for remediation testing.

- The Company did not maintain effective controls over the quarterly and annual financial reporting processes, with respect to preparation, review, supervision, and monitoring of accounting operations. The Company did not maintain effective controls over reconciliation of certain accounts and timely preparation and review of quarterly financial information.

- The Company did not design or maintain effective controls over the recording of capitalized interest regarding the recorded costs of pipeline assets and were understated in prior quarters for interest costs for debt related to assets under construction that had not been placed in service.

- The Company did not design effective controls over share-based compensation expense, which was recorded in the Company's general and administrative expenses. The Company did not design effective controls related to the review of supporting details, including the accuracy of the volatility inputs and calculations and the manual journal entries for share-based compensation expense. This control deficiency resulted in a misstatement of the Company's general and administrative expense and share-based compensation related disclosures for the three and six-month periods ended June 30, 2012 and resulted in the restatement of the financial statements for such fiscal periods, and resulted in revised condensed consolidated financial statements for the three-and nine-month periods ended September 30, 2012. The Company was unable to demonstrate remediation of this deficiency as there were not enough transactions to test for remediation as of December 31, 2012.

*Leasehold Property Costs*

- The Company did not design effective controls to provide reasonable assurance over the accuracy and completeness of master files of lease records. The Company did not have effective controls over the allocation of leasehold property costs due to unreliable supporting lease and property records.

- The Company did not maintain effective controls over completeness and accuracy of the well acreage data resulting in inaccurate transfers of leasehold property costs during the year.

- The Company did not have effective controls over review of properties for expirations and impairments of unproven acreage, as events were not properly considered that affected the value of leases.

- The Company did not maintain adequate supporting documentation or effective controls over the review of changes to division of interest records.

*Complex Accounting Issues*

- The Company did not design an effective control environment over complex equity instruments including convertible preferred stock and related arrangements. This material weakness resulted in the restatement of the Company's Series A Convertible Preferred Units of Eureka Hunter Holdings, LLC, the Company's preferred stock embedded derivative liabilities, and the loss on derivatives and related disclosures for the three and six-month periods ended June 30, 2012. This issue also resulted in adjustments to the Company's condensed consolidated financial statements for the three-and nine-month periods ended September 30, 2012. The Company was unable to demonstrate remediation of this deficiency as of December 31, 2012 as the control requires at least two quarters for remediation testing.

*Tax*

- The Company did not design or maintain effective controls over income tax accounting, specifically related to the accuracy of the net operating loss deduction carryover disclosed in the Company's financial statements.

46.     Similarly, during a June 14, 2013 conference call with investors and analysts discussing the Company's fourth quarter and full year 2012 financial and operating results, Defendant Ormand stated:

The material weaknesses on internal controls, we originally reported in our 8-K back in April when we dismissed PwC. They are disclosed in the Item 9A in our current 10-K and substantially the same as we disclosed before. There's no

additional weaknesses that are disclosed. The weaknesses are in 4 key areas: internal control, environment, financial reporting, leasehold property costs and complex accounting issues. Obviously, we take these matters extremely seriously and have been working very diligently, even through this reporting process, to begin addressing those and begin addressing those in mid-2012.

One of the key things we've done is significantly expand, upgrade our accounting personnel. Obviously, we hired a new Chief Accounting Officer, Fred Smith. We've hired a new Head of Tax, which we had, had done outside the firm previously. We've hired a new Head of Financial Reporting and beefed up that area with additional staff. We've hired a new Controller, 2 Regional Controllers and an Assistant Controller. And we have a new Head of Internal Control, which was also outsourced previously. We are also using a Big 4 accounting firm, assisting us in the areas of tax and internal controls. We have a remediation plan that is in place. The primary aspects of that, obviously, are a new and more qualified people. New processes that will create efficiencies and more timely reporting for the company and a new integrated accounting system. And this will be occurring throughout 2013 and into early 2014. So we are committed to remediating all of these material weaknesses. We believe that is achievable.

**D.     Defendants' Misconduct Results in Significant Damage to MHR**

47.     As a result of Defendants' misconduct, MHR has suffered significant damages and will continue to suffer damages unless immediate action is taken by the Company against the wrongdoers.  As discussed above, the Defendants repeatedly filed with the SEC inaccurate and unreliable financial statements.  When the truth was ultimately revealed, the Company's stock price collapsed, thereby undermining investor's confidence in MHR, as well as the Company's ability to raise equity and debt on terms favorable to the Company.  In addition, in  the Company's 2012 Form 10-K the Company disclosed that not only was MHR the subject of numerous class action lawsuits accusing the Company and certain officers of securities law violations, but that the SEC's Division of Enforcement was conducting its own inquiry regarding the Company's "internal controls, change in outside auditors and public statements to investors." The severe problems confronting MHR due to Defendants' misconduct has and continues to be well documented in the financial press.

## DERIVATIVE ALLEGATIONS

48.    Plaintiff brings this Complaint derivatively in the right and for the benefit of MHR to redress injuries suffered and to be suffered by MHR as a direct result of the violations of fiduciary and other common law duties by the Defendants to MHR and its public shareholders. This is not a collusive action to confer jurisdiction on this Court that it would not otherwise have.

49.    Plaintiff will adequately and fairly represent the interests of MHR and its public shareholders in enforcing and prosecuting their rights.

50.    Plaintiff has not made any demand on the Board of Directors of MHR to institute this action because such demand would be a futile and useless act for the following reasons:

a.    There was a sustained and systematic failure of the Board to exercise oversight, in that the directors and officers knew of and/or approved the violations of ethics, internal guidelines, law and standards of conduct.  The Individual Defendants' decision to engage in this conduct was not made in good faith and was contrary to the best interests of the Company;

b.    The acts complained of herein constitute serious violations of fiduciary and common law duties owed by MHR's Board of Directors and the other defendants and these acts are incapable of ratification;

c.    The Individual Defendants intentionally breached and/or recklessly and/or negligently disregarded their fiduciary duties;

d.    The Board has failed to commence any legal action against the principal wrongdoers.  In fact, while the Company's 2012 Form 10-K discusses a remediation plan, the Company has failed to announce any actions being taken by the Company against the

27

wrongdoers for the substantial damages suffered and that will continue to be suffered by the Company as a result of Defendants' misconduct;

e.      The known principal wrongdoers are in a position to, and do, dominate and control the MHR Board, paying them high annual and monthly fees to assure their compliance.  Thus, the Board could not exercise independent objective judgment in deciding whether to bring this action nor vigorously prosecute this action;

f.      The acts complained of herein are unlawful, unreasonable, and contrary to MHR's own code of ethics and corporate governance standards, and thus are incapable of ratification; and

g.      The members of the MHR Board, including each of the Defendants herein, receive substantial benefits (as referenced above) and other emoluments by virtue of their membership on the Board and their control of MHR.  Bringing an action or even adequately investigating other directors, who have the power to terminate a director's employment, would not likely occur.  The Defendants are incapable of exercising independent objective judgment in deciding whether to bring this action.  More specifically, the Proxy Statement identifies numerous relationships and transactions which would make a demand on the Board futile and wasteful.  For example:

**Certain Relationships and Related Transactions**

•      *Airplane Rental.*

During 2011, [MHR] rented an airplane for business use at various times from Pilatus Hunter, LLC, an entity wholly owned by Mr. Evans. Airplane rental expenses totaled $463,000 for the year ended December 31, 2011.

•      *GreenHunter Transactions*.

As discussed in the "Committee Interlocks and Insider Participation" section, Gary C. Evans, our Chairman and Chief Executive Officer, is the Chairman, Chief

Executive Officer and a major stockholder of GreenHunter; Ronald D. Ormand, our Chief Financial Officer and a member of our Board, is a director of GreenHunter. David S. Krueger, who served as our Chief Accounting Officer from October 2009 to October 23, 2012, is the Chief Financial Officer of GreenHunter.

During 2011, we obtained accounting services and use of office space from GreenHunter. Professional services expenses totaled $162,000 for the year ended December 31, 2011. All accounting services are now managed entirely by Magnum Hunter employees, who provide accounting services to GreenHunter for approximately $8,300 per month.

On October 13, 2011, the Company purchased an office building from GreenHunter for $1.7 million. In conjunction with the purchase, the Company obtained a term loan from a financial institution in the amount of $1.4 million due on November 30, 2017, a portion of which loan is guaranteed by Mr. Evans. The building houses the accounting functions of Magnum Hunter, and the building purchase enabled the Company to terminate the previous services arrangement, as described above.

During the year ended December 31, 2011, Eagle Ford Hunter, Inc., Triad Hunter, LLC and Hunter Disposal, LLC, wholly owned subsidiaries of the Company, rented storage tanks for disposal water, frac tanks and equipment from GreenHunter. Rental costs totaled $1.3 million for the year ended December 31, 2011, and $522,040 for the period from January 1, 2012 through November 26, 2012. The rental agreement contained terms comparable to those that could be obtained from third parties in the marketplace, and the parties thereto intend to enter into a new agreement with substantially similar terms. The new agreement is expected to have a term of 24 months, which would continue on a month-to-month basis following the expiration of the initial term.

On February 17, 2012, Triad Hunter, LLC, sold all of its equity interest in Hunter Disposal, LLC to GreenHunter Water, LLC, a wholly-owned subsidiary of GreenHunter, for a purchase price of $8.8 million, subject to adjustment for certain working capital, earnings and other similar items. The terms and conditions of the purchase agreement between the parties were approved by an independent special committee of the Board. The special committee retained independent counsel and an independent consultant to assist in the negotiation, execution and closing of the sale. The consideration received by Triad Hunter, LLC consisted of cash, restricted common stock of GreenHunter, 10% cumulative preferred stock of GreenHunter, and a convertible promissory note of GreenHunter. In connection with the sale, Triad Hunter, LLC entered into agreements with Hunter Disposal, LLC and GreenHunter Water, LLC for wastewater hauling and disposal capacity in Kentucky, Ohio and West Virginia pursuant to which Triad Hunter, LLC paid fees totaling $1,802,572 for the period from January 1, 2012 through November 26, 2012. Triad Hunter, LLC also

entered into tank rentals with GreenHunter Water, LLC pursuant to which Triad Hunter, LLC paid fees totaling $370,905 for the period from January 1, 2012 through November 26, 2012.

On August 1, 2012, Alpha Hunter Drilling, LLC ("Alpha Hunter"), a wholly owned subsidiary of the Company, entered into two International Association of Drilling Contractors ("IADC") Drilling Bid Proposal and Daywork Drilling Contracts with GreenHunter Water, LLC, a wholly-owned subsidiary of GreenHunter ("GreenHunter Water"), pursuant to each of which Alpha Hunter agreed to provide drilling rig and contract operator services to GreenHunter Water for the purpose of drilling a saltwater disposal well to service the Company's Eagle Ford Shale operations in South Texas. Alpha Hunter anticipates that it will take approximately 10 to 12 days to drill each well, resulting in a total drilling fee of approximately $155,000 per well. In addition, Alpha Hunter and GreenHunter Water expect to enter into one or more additional IADC Contracts with similar drilling fees.

The Company anticipates that Eureka Hunter Pipeline, LLC ("Eureka Pipeline"), which is a subsidiary of Eureka Hunter Holdings, LLC, a majority owned subsidiary of the Company ("Eureka Holdings"), will enter into a Water Hauling and Disposal Agreement with GreenHunter Water pursuant to which GreenHunter Water would dispose of condensate and salt water from wellhead production that is delivered to Eureka Pipeline's pipeline system from various producers. Pursuant to the Water Hauling and Disposal Agreement, Eureka Pipeline would pay GreenHunter Water a per-barrel fee for transportation and disposal of the condensate and salt water that over the course of eight years, the anticipated term of the agreement, could total up to $5 million.

•      *TransTex Acquisition.*

In April 2012, the Company, through Eureka Holdings, acquired certain assets of TransTex Gas Services, LP ("TransTex"). The purchase price paid for the acquired assets consisted of cash and Class A Common Units ("Eureka Common Units") representing membership interests in Eureka Holdings. In connection with the acquisition, the Company agreed to provide the limited partners of TransTex the opportunity to purchase Eureka Common Units in lieu of a portion of the cash TransTex would otherwise receive for the acquired assets. Consequently, during April 2012, certain limited partners of TransTex, which included Mr. Evans, who held a small limited partnership interest in TransTex, purchased Eureka Common Units, and the cash consideration paid to TransTex for the acquired assets was reduced. Mr. Evans purchased 27,641 of such Eureka Common Units for $553,000 at the same purchase price offered to all TransTex limited partners. As of the date of this proxy statement, Mr. Evans owns less than 1% of the total number Eureka Common Units currently outstanding.

## FIRST CAUSE OF ACTION

## AGAINST ALL DEFENDANTS FOR BREACH OF FIDUCIARY DUTIES

51.     Plaintiff incorporates by reference all preceding and subsequent paragraphs as if fully set forth herein.

52.     Defendants owed and owe MHR fiduciary obligations.   By reason of their fiduciary relationships, Defendants specifically owed and owe MHR the highest obligation of good faith, fair dealing, loyalty and duty of care.

53.     As alleged herein, each of the Defendants had a fiduciary duty to, among other things, exercise good faith to ensure that the Company's financial statements were reported accurately, and, when put on notice of problems with the Company's business practices, internal controls, and operations, exercise good faith in taking appropriate action to correct the misconduct and prevent its recurrence.

54.     Defendants willfully ignored the obvious and pervasive problems with MHR's internal controls and practices and procedures and failed to make a good faith effort to correct these problems or prevent their recurrence.

55.     Defendants, and each of them, violated and breached their fiduciary duties of care, loyalty, reasonable inquiry, oversight, good faith and supervision.

56.     As a direct and proximate result of Defendants' failure to perform their fiduciary obligations, MHR has sustained damages, not only monetarily, but also to its corporate image, reputation and goodwill.

## SECOND CAUSE OF ACTION

## AGAINST ALL DEFENDANTS FOR ABUSE OF CONTROL

57.     Plaintiff incorporates by reference and realleges each and every allegation set forth above, as fully set forth herein.

58.     Defendants' misconduct alleged herein constituted an abuse of their ability to control and influence MHR, for which they are legally responsible.  In particular, Defendants abused their positions of authority by causing or allowing MHR to misrepresent material facts regarding its internal controls and operations.

59.     As a direct and proximate result of Defendants' abuse of control, MHR has sustained significant damages.

60.     As a result of misconduct alleged herein, Defendants are liable to the Company.

61.     Plaintiff, on behalf of MHR, has no adequate remedy at law.

## THIRD CAUSE OF ACTION

## AGAINST ALL DEFENDANTS FOR WASTE OF CORPORATE ASSETS

62.     Plaintiff incorporates by reference and realleges each allegation contained above, as though fully set herein.

63.     As a result of the misconduct described above, and by failing to properly consider the interests of MHR and its public shareholder, Defendants have caused MHR to incur substantial costs in connection with diverting MHR funds to GreenHunter for internal auditing services, an entity that is controlled and/or managed by Defendants Evans, Ormand, and Krueger, despite the fact that GreenHunter could not meet the independence standards for internal auditing.

64.     Because of this waste of corporate assets, Defendants are liable to the Company.

65.     Plaintiff, on behalf of MHR, has no adequate remedy at law.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff prays for judgment as follows:

A.     Against all Defendants and in favor of the Company for the amount of damages sustained by the Company as a result of Defendants' breaches of fiduciary duties;

B.     Directing MHR to take all necessary actions to reform and improve its corporate governance and internal procedures to comply with applicable laws and to protect the Company and its shareholders from a repeat of the damaging events described herein, including, but not limited to, putting forward for a shareholder vote resolutions for amendments to the Company's By-Laws or Articles of Incorporation and taking such other action as may be necessary to place before shareholders a proposal to strengthen the Board's supervision of financial reporting, operations and develop and implement procedures for greater shareholder input in to the policies and guidelines of the Board;

C.     Awarding MHR restitution from Defendants, and each of them, and ordering disgorgement of all profits, benefits and other compensation obtained by the Defendants;

D.     Awarding Plaintiff the costs and disbursements of the action, including reasonable attorneys' fees, accountants' and experts' fees, costs, and expenses; and

E.     Granting such other and further relief as the Court deems just and proper.

## JURY DEMAND

Plaintiff demands a trial by jury.

DATED: June 18, 2013

O'KELLY ERNST & BIELLI, LLC

*/s/ Ryan M. Ernst*
Ryan M. Ernst (No. 4788)
901 North Market Street, Suite 1000
Wilmington, DE 19801
(302) 778-4000
(302) 295-2873
rernst@oeblegal.com

*Attorneys for Plaintiff*

**OF COUNSEL:**

Joseph H. Weiss
James E. Tullman
WEISSLAW LLP
1500 Broadway, 16th Floor
New York, NY 10036
(212) 682-3025
(212) 682-3010 (facsimile)
jtullman@weisslawllp.com